PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 97-2138

D. C. Docket No. 93-1283-CIV-T-17A

MICHIGAN MILLERS MUTUAL INSURANCE
CORPORATION, a foreign corporation,

                                        Plaintiff-Counter-Defendant-Appellant,

versus

JANELLE R. BENFIELD,

                                        Defendant-Counter-Claimant-Appellee.

Appeal from the United States District Court
for the Middle District of Florida

**(May 4, 1998)**

Before EDMONDSON and BIRCH, Circuit Judges, and FAY, Senior Circuit Judge.

FAY, Senior Circuit Judge:

This suit concerns the liability of Michigan Millers Mutual Insurance Corporation ("Millers") to its insured, Florida resident Janelle Benfield, for property loss due to fire. Millers appeals as error the district court's striking of the testimony of Millers' fire causation expert under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and the district court's granting of Mrs. Benfield's motion for directed verdict as to Millers' arson defense. Millers also contends the trial

court erred in directing a verdict against Millers' claim that Mrs. Benfield breached the concealment and fraud provision of the homeowners insurance contract. Finally, Millers argues that the district court erred when it determined Mrs. Benfield would not be barred from recovery under the insurance policy by the conduct of her co-insured, her ex-husband. Finding no abuse of discretion by the trial court in excluding the expert testimony of Millers' fire causation expert, and finding no error by the trial court in applying Florida's innocent co-insured doctrine to the facts of this case, we affirm in part. We reverse in part, however, to the extent that we find it was error on the part of the trial court to direct verdicts as to Millers' arson defense and as to Millers' concealment and fraud defense. Accordingly, we remand this matter to the district court for a new trial.

## I. STATEMENT OF THE CASE

On January 13, 1988, Mrs. Benfield and her then husband, Richard M. Benfield,[1] entered into an insurance contract with Millers for homeowner's insurance for their home on 1838 Joyce Street in Sarasota, Florida. The policy issued to the Benfields is a standard homeowners insurance policy in that it describes the rights and obligations of the insurer and the insured under the insurance contract. Section I of the homeowner's policy issued by Millers provides protection for loss for personal property destroyed by fire. Included in the policy, however, are exclusions and conditions that limit this protection.[2] On July 6, 1992, the Benfield residence on Joyce Street caught fire. To

---

[1]For the sake of clarity, the defendant will be referred to as "Mrs. Benfield," and her husband who is not a party to this action will be referred to as "Mr. Benfield."

[2]Of particular relevance to this dispute, the policy states:

**Section I - EXCLUSIONS**
**1.**We do not insure for loss caused directly or indirectly by any of the following.
. . . .
    **(h): Intentional Loss,** meaning any loss arising out of any act committed:

2

date, the cause of this fire has not been determined.

Of some import to this dispute between insurer and insured is the relationship that Mrs. Benfield had with her husband. At the time of the fire, Janelle Benfield was married to Richard Benfield. Their marital relationship was a troubled one and Mr. Benfield had moved out of the house for an extended period before moving back into the house in December of 1991. Living together for economic reasons and for the sake of their daughter, the couple kept separate bank accounts and slept in separate rooms. Realizing their marriage was at an end, the Benfields listed their house with a realtor in May of 1992. Janelle Benfield sought to negotiate a property settlement with her husband, and sought her husband's execution of a quit claim deed of the marital home, their largest asset. Mr. Benfield refused to sign the quit claim deed, and Mrs. Benfield began plans to move out, going so far as to locate an apartment and to begin packing her belongings in the home.

On Wednesday, July 1, 1992, Mr. Benfield physically assaulted Mrs. Benfield in the residence. Their daughter was on her annual vacation with her grandparents. Mrs. Benfield called the police and Mr. Benfield was arrested. On Thursday, July 2, Mr. Benfield was released under a temporary restraining order that mandated he not return to the marital home while the order was in effect. Mrs. Benfield testified at trial that on Thursday night she went on a date with Marion

---

(1) by or at the direction of an **insured**; and
(2) with the intent to cause a loss.
. . . .
**Sections I and II - CONDITIONS**
. . . .
**2. Concealment or Fraud.** We do not provide coverage for an **insured** who has:
    a. intentionally concealed or misrepresented any material fact or circumstance; or
    b. made false statements or engaged in fraudulent conduct;
    relating to this insurance.

3

Sommers, and that Sommers, after noticing her bruises, invited her to stay with him over the July

4th weekend.  Mrs. Benfield agreed to spend the weekend at his home.  Mrs. Benfield testified that

the last time she was at the home before the fire was on Saturday, July 4, with Sommers, when she

returned home to get a change of clothes and to tend to the family pets, her daughter's cat and her

mother's dog.  Before leaving with the dog,[3] Mrs. Benfield left the windows partly open and the

sliding back doors on the back of the house open.[4]  Additionally, Mrs. Benfield pointedly only

locked the doors at the door knobs and did not lock the dead bolt locks on the doors.[5]  The only keys

to the dead bolt locks were in the possession of Mrs. Benfield and her daughter, who was away on

vacation.

Mrs. Benfield testified at trial that she did not return to the house until July 6.  When she and

Sommers returned to the house on Monday July 6, they found the house different from when they

left it on Saturday -- the windows and blinds were closed and the front door was locked with the

dead bolt lock.[6]  Upon opening the front door, Mrs. Benfield saw black smoke and flames to her

right in the dining area.  According to Mrs. Benfield's and Sommers' testimony, she entered the

house to call the fire department while Sommers began to douse the fire with a garden hose.

---

[3]Mrs. Benfield testified that she took the dog because it was distressed and not faring well in the house on its own.

[4]Mrs. Benfield testified that she did this because the air conditioner was not working and that she left the sliding glass doors open so that the cat could exit the house via the "doggy" door on the screened porch.

[5]Mrs. Benfield testified that she did this because she feared her husband would return to break into the house and she sought to avoid the expense of repairs of damage caused by a break-in.

[6]After the fire was out, the pair discovered that the sliding glass doors were locked and closed as well.

4

Sommers was able to extinguish the fire before the fire department arrived.[7]

There is no dispute that the fire began on top of the dining room table in the dining area just inside the front door of the house. On the Saturday before the fire, Mrs. Benfield had left on top of the table three or four bags of clothes and other items to go to a consignment shop and to Goodwill. On top of these items she left the quit-claim deed form. Also left on the table on Saturday was a plastic lamp oil bottle that was half-full and sealed by a screw top lid. A chandelier hung directly over the dining room table, and testimony was introduced at trial that the chandelier often flickered.

Forty-five minutes to an hour after the fire was extinguished, Lieutenant Brian Kehoe of the Sarasota Fire Department examined the fire scene for approximately two hours. On the floor of the dining area Kehoe found the plastic oil lamp bottle undeformed and undamaged by any heat or fire. It was empty of its contents. The plastic screw cap was found a few feet away, similarly undamaged by fire or heat. In his investigation, Kehoe used a hydrocarbon detector called a "sniffer" to search for the presence of hydrocarbons at the fire scene. The presence of hydrocarbons could indicate that a liquid accelerant, such as lamp oil, was used to start the fire intentionally. The sniffer failed to locate any hydrocarbons either in the lamp oil bottle or elsewhere at the fire scene. Kehoe testified that he could not determine the exact cause of the fire, but stated that his personal opinion was that the cause of the fire was of a "suspicious nature."[8] Additionally, Kehoe testified that he did not recall seeing any evidence that the fire scene had been sprayed with water.

William Buckley, Millers' arson investigator, arrived at the scene three days after the fire.

---

[7]The parties dispute how the fire began fire and how the fire was extinguished.

[8]On cross-examination, Kehoe stated that, if he were pressed, he would probably say that the fire was incendiary in nature, i.e. intentionally set, but that since he was unable to locate an ignition source, like a match, he felt he could not report the fire as incendiary.

After reviewing the fire site, he determined the fire was intentionally set. Buckley arrived at this conclusion because there was no accidental source of ignition where the fire originated, on top of the dining room table.

Mrs. Benfield's house and personal belongings contained in the house sustained serious damage as a result of the fire, with every room in the house sustaining damage from the black smoke generated by the blaze in the dining area. In September of 1992, Mrs. Benfield filed a claim with Millers and sought to recover the replacement value of the goods that she lost as a result of the fire.[9] On July 21, 1992, as part of a marital settlement agreement, Mr. Benfield transferred his interest in the home to Mrs. Benfield via a quit-claim deed.[10] Mr. Benfield filed no claim with Millers regarding the July 6 fire and in fact has affirmatively waived any rights he might have to insurance proceeds. Millers denied Mrs. Benfield's claim in a letter dated March 8, 1993, stating that their denial was based on her intentional misrepresentation and concealment of facts and her participation in the intentional setting of the fire in her house.

In August of 1993, Millers brought this declaratory judgment action in federal court, asking that the trial court determine Millers' liability to Mrs. Benfield for the fire damage. Mrs. Benfield counterclaimed, alleging that Millers had breached their insurance contract with her and was liable for her loss. In July of 1994, Mrs. Benfield sought to add Mr. Benfield to the litigation[11] as a defendant asserting that he was an indispensable party. Mrs. Benfield argued that if the fire was

---

[9]Mrs. Benfield prepared a detailed inventory of damaged and destroyed personal property, claiming that the replacement value of the goods lost in the fire was approximately $92,000.00.

[10]Mr. and Mrs. Benfield divorced on July 21, 1992.

[11]Mr. Benfield had not been named as a defendant in the declaratory judgment complaint brought by Millers. Mrs. Benfield was the only defendant named in the complaint.

intentionally set, Mr. Benfield was likely the responsible party in that Mr. Benfield had both financial and personal motives in setting the fire. Mrs. Benfield also argued that it was possible that Mr. Benfield negligently started the fire since he was a heavy drinker and smoked cigarettes. Millers vigorously opposed the motion for joinder and prevailed. Shortly before trial began Millers sought to amend their complaint to add language alleging that Mrs. Benfield or Mr. Benfield burned or caused the property to be burned, rather than the original language which alleged only that Mrs. Benfield was responsible for the fire. This motion was denied and the case proceeded to trial on the original complaint. Prior to trial, the district court granted Mrs. Benfield's motion in limine to exclude evidence that Mr. Benfield intentionally set the fire or made misrepresentations to Millers. The case proceeded to a jury trial. After striking the testimony of Millers' fire causation expert, the trial court directed a verdict against Millers on their arson defense. Further, the trial court, upon a motion by Mrs. Benfield, granted a directed verdict as to Millers' claim that she voided the insurance contract by breaching the concealment or fraud provision of the contract. Millers now appeals these rulings by the trial court.

## II. DISCUSSION

### A. The Exclusion of Millers' Fire Expert

Millers contends that the trial court erred in striking the testimony of William Buckley, their expert on the fire's origin. We review the trial court's legal decision to apply Daubert to Buckley's testimony regarding the origin of the fire de novo. See Carmichael v. Samyang Tire, Inc., 131 F.3d 1433 (11th Cir. 1997) (citations omitted). Millers argues, in light of Carmichael, that the district court's determination that their expert should be held to the standard articulated in Daubert was in error, and as such, the trial court's decision to strike the testimony of Buckley was in error. Millers

7

argues that <u>Carmichael</u> made clear that the <u>Daubert</u> criteria apply only to scientific testimony, and the testimony of their expert was not based on scientific principles but rather was based on his years of experience, and on his skill and experience-based observations.[12] We disagree and find no error in the application of the <u>Daubert</u> criteria to this expert's testimony.

We do not hesitate in finding that Buckley's testimony was science-based, rather than experience-based, and as such is subject to <u>Daubert</u>'s inquiry regarding the reliability of such testimony. <u>See</u> <u>Carmichael</u>, 131 F.3d at 1435. Unlike the expert witness in <u>Carmichael</u>, who made no pretense that he was basing his testimony on anything other than his own experience in analyzing failed tires, Buckley held himself out as an expert in fire <u>sciences</u>,[13] and testified that he could determine the origin of the fire through his knowledge of the science of fires. During his direct examination, Buckley testified that he had complied with the scientific method within his field of science in determining the cause and origin of the fire.[14] Moreover, counsel for Millers, in their

---

[12]Fundamentally, in applying the <u>Daubert</u> criteria, the trial court must render an "assessment of whether the reasoning or scientific methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-593.

[13]From the cross-examination of Buckley during trial:

Q: Well, let's just stop for a second, you hold yourself out as an expert in the area of fire science, don't you?
A: Yes.

[14]From the direct exam of Buckley during trial:

Q: Sir, are you familiar with the scientific method and procedure in your field, in your field, science field, of determining the cause and origin of fires?
A: Yes.
Q: And did you comply with that accepted method and procedure?
A: Yes, I did.
Q: And as a result of that accepted method and procedure, have you come to the expert opinions you've shared with the jury here today?

8

briefs to this court filed before <u>Carmichael</u> was issued, took pains to stress the scientific nature of Buckley's inquiry into the fire's origin.[15] The use of "science" to explain how something occurred has the potential to carry great weight with a jury, explaining both why counsel might seek to couch an expert witness's testimony in terms of science, as well as why the trial judge plays an important role as the gate-keeper in monitoring the evidentiary reliability of such testimony. <u>See</u> <u>Daubert</u>, 509 U.S. at 590. Because of the manner in which this expert's testimony was presented to the jury, we find no error by the trial court in determining <u>Daubert</u> applied to the testimony at issue.

Millers next argues that even if <u>Daubert</u> does apply to their expert's testimony, the trial court erred in striking the testimony of Buckley since his opinion testimony regarding the fire's origin was supported by reliable procedures and scientific methodology. We disagree. Abuse of discretion is the proper standard of review of a trial court's evidentiary rulings. <u>See</u> <u>General Elec. Co. v. Joiner</u>, 118 S. Ct. 512, 517 (1997). It is very much a matter of discretion with the trial court whether to permit the introduction of such evidence, and we will not reverse the decision of the trial court regarding the exclusion or admission of such evidence unless the trial court's decision is "manifestly

A: Yes, I did.

[15]"Mr. Buckley meticulously went through the photographs of the fire scene, explaining the science and methodology of his determination. . . ." (App. Brief at 20); "Mr. Buckley conducted a meticulous and scientific deductive analysis . . . ." (App. Brief at 22); Buckley "testified that he did apply the scientific method to this fire investigation by developing hypotheses and testing them." (App. Brief at 22). <u>Daubert</u>, published in 1993, made clear that its criteria only applied to scientific testimony of experts under Rule 702 of the Federal Rules of Evidence, and that Rule 702 also applied to "technical, or other specialized knowledge." 509 U.S. at 590 n. 8. Additionally, <u>Berry v. City of Detroit</u>, 25 F.3d 1342, 1349-1350 (6th Cir. 1994), <u>quoted in</u> <u>Carmichael</u>, 131 F.3d at 1435-1436, with its illustrative "bee-keeper v. aeronautical engineer" analogy, makes clear that if an expert's testimony is based on his experience, and not on science, then such non-scientific expert testimony is not to be held to the <u>Daubert</u> standard. Accordingly, we do not consider it unfair to hold Millers' counsel to their decision to introduce their expert's testimony as scientific expert testimony rather than experiential, non-scientific expert testimony.

9

erroneous." Id.

At trial, Millers' fire causation expert tried to explain how he came to the conclusion that the fire in the Benfield home was intentionally set. Buckley stated at trial that he came to his opinion that the fire was intentionally set by eliminating all accidental causes, and by determining that, given that the fire began on the dining room table, there were no other possible sources of ignition of the fire. Essentially, the testimony of Buckley reveals that he came to his opinion that the fire was incendiary largely because he was unable to identify the source of the ignition of the fire. In determining that the fire was incendiary, Buckley performed no tests and took no samples. At trial, Buckley was unable to describe the chandelier that hung over the table and unable to explain the methodology by which he eliminated the chandelier as a possible ignition source for the fire. After telling the jury on direct that he believed someone poured lamp oil from the lamp oil bottle over the clothes and set the clothes ablaze, on cross-examination Buckley admitted that he did not know even if the lamp oil bottle had contained lamp oil before the fire and that there was no scientific basis for such an opinion. With such testimony as a backdrop, the district court granted the motion by Mrs. Benfield to strike the testimony of Buckley, finding that while Buckley held the opinion that the fire was intentionally set, he was unable to rationally explain how he came to that conclusion. "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." Joiner, 118 S. Ct at 519. Accordingly, we find no abuse of discretion by the trial court in the exclusion of such testimony.

**B. The Directed Verdicts**

Shortly after striking the testimony of Buckley, the trial court directed a verdict against

Millers' arson defense. Millers argues that even if Buckley's testimony was properly stricken, there was still ample evidence of arson to allow a reasonable jury to find that Mrs. Benfield participated in setting the fire at her residence. Millers also contends the trial court erred in granting a directed verdict against Millers' argument that Mrs. Benfield should be barred from collecting proceeds under the policy because she violated the concealment or fraud provision of the policy. Millers again contends that in light of the evidence presented a trial, the trial court erred in taking this issue from the jury.

We review the district court's granting of a directed verdict <u>de novo</u>, applying the same standard applied by the district court in its determination to grant a directed verdict. See <u>Hibiscus Assoc. Ltd. v. Bd. of Trustees</u>, 50 F.3d 908, 920 (11th Cir. 1995). In considering a motion for directed verdict, a court must view all evidence in the light most favorable to the nonmoving party, here Millers, and draw all reasonable inferences in favor of the nonmoving party. See <u>Isenbergh v. Knight-Ridder Newspaper Sales, Inc.</u>, 97 F.3d 436, 439 (11th Cir. 1996). In deciding whether or not to grant a directed verdict, the court may not decide the credibility of witnesses nor weigh the evidence. <u>Id.</u> Where substantial conflicting evidence exists in the record, a directed verdict is improper. See <u>Davis v. Wal-Mart Stores, Inc.</u>, 967 F.2d 1563, 1567 (11th Cir. 1992).

**1. The Directed Verdict on Millers' Arson Defense**

To determine if a directed verdict was authorized on the issue of arson, we must look first to see whether Millers has presented a prima facie case of arson under Florida law.[16] Under Florida law, in order for an insurer to establish a prima facie case of arson for purposes of denying coverage

---

[16] A court which sits in diversity jurisdiction, as we do here, is required to apply the rules of law for the state in which it sits. See <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487 (1941).

11

under an insurance policy, the insurer must put forth either direct or circumstantial evidence of motive, opportunity, and an incendiary cause of fire which would allow reasonable people to conclude that the insured was guilty of the burning.  See Ins. Co. of North America v. Valente, 933 F.2d 921, 923 (11th Cir. 1991).

At trial, evidence was introduced that Mrs. Benfield was having trouble selling her home and that she was having difficulty getting her husband to agree to transfer the marital home to her. Additionally, evidence was introduced indicating that Mrs. Benfield stood to walk away with a substantial sum of money (over $92,000) should her claim filed with Millers be paid in full.  From such evidence, a reasonable jury could conclude that she had ample motive to set fire to her home.

On the issue of opportunity, the evidence showed that the house was locked only at the door knobs and not at the dead bolts when Mrs. Benfield left the house on Saturday.  The evidence also shows that Mrs. Benfield and her daughter were the only ones with keys the dead bolt locks and that her daughter was away on vacation when the blaze broke out.  Additionally, the evidence shows that when Mrs. Benfield "discovered" the fire on Monday, the house was different from when she had left it, with the windows closed, the shades drawn and the dead bolts locked.  From such evidence a reasonable jury could conclude that Mrs. Benfield had the opportunity to set the fire.

The final element for a prima facie case of arson is that the fire was incendiary, or intentionally set.  There was evidence apart from Buckley's testimony from which a reasonable jury could conclude that there was an incendiary cause of the fire.  There was complete agreement that the fire began on top of the dining room table, an unusual place for a fire to ignite.  Further, Mrs. Benfield's testimony  indicates that the home had been entered after her visit on Saturday, and that whoever had entered the home had closed the windows, drawn the shades, and locked the doors at

the dead bolts. There was evidence that a capped, half-full lamp oil bottle had been on the table before the fire, and after the fire the bottle was found on the floor in the debris, with the cap off and the bottle empty. The condition of the bottle and cap indicated that it had not been damaged in the fire and that the screw-cap may have been removed and had not been blown off by the exploding or expanding contents of the lamp oil bottle. Such circumstantial evidence could lead a reasonable jury to conclude that the fire had been set by a person, and was not naturally occurring. Finally, and most compelling, there was the testimony of Lt. Kehoe of the Sarasota Fire Department, who testified that in his personal opinion, the fire was intentionally set and that the only reason he did not officially report the fire as incendiary was because he had been unable to find a match or some other ignition source.

After a thorough review of the record, we are persuaded that Millers had established a prima facie case of arson from which a reasonable jury could conclude that Mrs. Benfield burned or caused her property to be burned. Accordingly, it was reversible error for the trial court to take this issue from the jury and grant a directed verdict on her behalf.

## 2. The Directed Verdict on the Concealment or Fraud Issue

In order for Mrs. Benfield to recover for her fire loss under the insurance policy, she was obligated to comply with the conditions of the policy. One such condition that Millers contends Mrs. Benfield violated is the concealment or fraud provision of the contract.[17] Millers contends Mrs. Benfield violated this provision by making false statements in the course of the insurance company's investigation, by misrepresenting material facts, and by acting to conceal important or damaging facts. At trial, Millers offered evidence of possible misrepresentations by Mrs. Benfield in the

[17]The text of this provision is quoted in note 2 of this opinion.

13

filing and investigation of her claim for her loss due to the July 6 fire. Millers elicited testimony from Mrs. Benfield, from Mrs. Benfield's husband Marion Sommers, and from other witnesses which brought out inconsistencies in Mrs. Benfield's recollection of the circumstances surrounding the fire, and revealed questionable conduct by Mrs. Benfield in responding to Millers' requests for cooperation and information in the investigation of her claim. Reviewing the evidence in the light most favorable to Millers, and drawing all reasonable inferences from the evidence in Millers' favor, we find there was ample evidence to warrant an inference by the jury that Mrs. Benfield knowingly and wilfully made false statements and representations to Millers on material matters in connection with the fire, thereby violating her contractual obligations to her insurer.[18]

The trial court based its decision to direct a verdict against Millers on its understanding that for a misrepresentation or concealment by Mrs. Benfield to be material, Millers must have

---

[18]The evidence of fraud adduced at trial included, but was not limited to:

(a) the claim, including the proof of loss valuing the total damage to Mrs. Benfield's personal property to be excess of $90,000, when Mr. Benfield testified at trial that he could estimate the value of the contents of the home to be roughly $25,000.00;
(b) the misrepresentation by Mrs. Benfield to Millers during their investigation of the fire that she had asked her now-husband Sommers, an alibi witness and an eyewitness regarding the discovery of the fire, to give his statement to Millers and that he had refused when in fact Sommers testimony at trial revealed Benfield had never approached Sommers to have him give a statement to Millers and he would have been glad to do so if asked;
(c) evidence that Mrs. Benfield was evasive about her whereabouts on the morning of the fire, giving various accounts regarding her whereabouts and her schedule to Millers during the investigation of her claim;
(d) Mrs. Benfield testified at trial that when she discovered the fire that her house was a mess and that framed pictures had been broken, and in her opinion this was evidence that someone had been in the home prior to the fire and vandalized it, while Sommers' testimony revealed the house had been in much the same condition the day before the fire occurred;
(e) Lt. Kehoe testified that he did not recall seeing any indication that water was sprayed on the scene contradicts the testimony of Mrs. Benfield and her husband Sommers that he put out the fire with a garden hose.

14

discovered the fraud and relied on such incidents of fraud in its denial of her claim on March 8, 1993. According to the trial court, the discovery by Millers of fraud or deceit after March 8, 1993, could not be a material misrepresentation, but only went to the Mrs. Benfield's credibility.[19] Such an understanding by the trial court is at odds with the law of this Circuit. That an insured should not be allowed to profit from his or her own fraud is a fundamental rule of law that requires little explanation. See Chaachou v. American Central Ins. Co., 241 F.2d 889, 892 (5th Cir. 1957). Moreover, the law of this Circuit is clear that this court will not require that an insurer demonstrate that it relied on the insured's misrepresentations when asserting a policy defense based on fraud; that a material fraud was perpetrated by an insured in pursuing an insurance claim is sufficient. Id. Accordingly, we hold that given the evidence presented at trial, it was error for the district court to direct a verdict against Millers on its fraud defense.

---

[19]An illuminating exchange at trial:

COURT: "I'm trying to get to the point of what were the false and material statements that were made by the . . . insured which justified their termination of the policy or denial of liability . . . .
        [T]here could be fifty brand new alleged material misstatements developed here at trial, but those were not the basis for the rejection of the liability under the policy. That's what I'm focusing on.
MR. FREEMON (Benfield's counsel): And that's our point, too. Anything post-March 8, 1993 goes to her credibility. Any misrepresentation before that date goes to the policy."

In directing a verdict against Millers on the fraud issue, the trial court stated:

The listing [of misrepresentations submitted by Miller] appears to be more consistent with a credibility argument than it is for a material misrepresentation.
        . . . .
There are differences between so-called credibility issues and material misrepresentations, frauds, and concealments. And the Court will, after having considered it all, grant the motion of the defendant . . . .

15

## C. The Innocent Co-Insured Issue

The final issue raised by Millers on appeal is the trial court's application of Florida's innocent co-insured doctrine in its decision to forbid Millers from introducing evidence of Mr. Benfield's possible arson and/or misrepresentation. Millers hoped to argue at trial that any improper conduct by Mr. Benfield would invoke an exclusion under the insurance policy that would apply to Mrs. Benfield, barring any recovery by Mrs. Benfield of insurance proceeds. The trial court ruled that, since by Millers' own pleading Mrs. Benfield was the only defendant at trial, the only evidence Millers could put forward regarding arson or misrepresentation would be evidence of Mrs. Benfield's own improper acts, and that Millers was barred by Florida's doctrine of the innocent co-insured from introducing any evidence of wrongdoing by Mr. Benfield in order to impute his misconduct to Mrs. Benfield.

We recognize that contract interpretation is generally a question of law and subject to de novo review on appeal. See Brewer v. Muscle Shoals Bd. of Educ., 790 F.2d 1515, 1519 (11th Cir. 1986). Additionally, where a district court interprets an insurance policy as a matter of law, the district court's construction of the policy is subject to de novo review. See Universal Underwriters Ins. Co. v. Stokes Chevrolet, Inc., 990 F.2d 598, 602 (11th Cir. 1993). After reviewing the record of the proceedings, we affirm the decision by the trial court to forbid the introduction of evidence by Millers of the misdeeds of Mr. Benfield in the attempt to saddle Benfield, as an innocent co-insured spouse, with responsibility for her alienated husband's actions.[20]

---

[20]We realize that as a defendant in this action, Millers alleges that Mrs. Benfield is anything but innocent. However, under this theory of imputed liability, Millers seeks to impute the conduct of Mr. Benfield to Mrs. Benfield without alleging that Mrs. Benfield had knowledge of or participated in any way in the alleged misdeeds of Mr. Benfield. For the purposes of imputed liability, then, Mrs. Benfield is indeed an "innocent" co-insured.

16

Florida's doctrine of the innocent co-insured provides that an innocent co-insured may recover under an insurance policy even where the loss was caused by another co-insured's intentional acts unless the insurance policy at issue makes clear that the policy at issue provides for joint coverage rather than several coverage. See Auto-Owners Ins. Co. v. Eddinger, 366 So. 2d 123, 124 (Fla. 2d DCA 1979), approved, Everglades Marina, Inc. v. American Eastern Dev. Corp., 374 So. 2d 517, 519 (Fla. 1979). Millers contends that the exclusions at issue unambiguously provide for joint coverage rather than several coverage. We disagree.

The insurance contract between Mrs. Benfield and Millers contains two provisions which, Millers argues, limits the liability of Millers under the home insurance policy and bars Mrs. Benfield from any recovery on account of the fire that occurred in her home in July of 1992. For ease of reading, we quote these provisions again:

> **Section I - EXCLUSIONS**
> **1.** We do not insure for loss caused directly or indirectly by any of the following.
> . . . .
>        **(h): Intentional Loss,** meaning any loss arising out of any act committed:
>             (1) by or at the direction of an **insured**; and
>             (2) with the intent to cause a loss.
> . . . .
> **Sections I and II - CONDITIONS**
> . . . .
> **2. Concealment or Fraud.** We do not provide coverage for an **insured** who has:
>        a. intentionally concealed or misrepresented any material fact or circumstance; or
>        b. made false statements or engaged in fraudulent conduct;
>        relating to this insurance.

Millers points to the language "an insured" in each provision and argues that such language unambiguously establishes that the insureds hold their rights and obligations jointly under the policy. The Florida Supreme Court has not dealt with this particular issue, nor has any Florida state court grappled with the issue of whether the language "an insured" clearly creates joint liability for an

17

innocent co-insured under an insurance contract. This is an issue of first impression before this court. As a question of Florida insurance law,[21] we look to the Florida courts for guidance for the resolution of this issue.

Florida law is clear that once the insured establishes a loss apparently within the terms of an insurance policy, the burden shifts to the insurer to prove that the loss arose from a cause which is excepted by the policy. See Hudson v. Prudential Property & Cas. Ins. Co., 450 So. 2d 565, 568 (Fla. 2d DCA 1984). Moreover, ambiguities in exclusionary provisions must be construed in favor of the insured since the insurer usually drafts the policy. See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Assoc., 117 F.3d 1328, 1337 (11th Cir. 1997); Excelsior Ins. Co. v. Pomona Park Bar & Package Store, 369 So. 2d 938, 942 (Fla.1979). "Florida law requires that we resolve a conflict between the provisions of an insurance contract so as to afford maximum coverage to the policyholder. This principle applies with even greater force when the draftsman of a form policy relies on inconspicuous language to defeat the very purpose for which the policy was procured." Nu-Air Mfg. Co. v. Frank B. Hall & Co. of New York, 822 F.2d 987, 992 (11th Cir. 1987) (citations omitted) (emphasis added); see also National Cas. Co. v. General Motors Acceptance Corp., 161 So. 2d 848, 852 (Fla. 1st DCA 1964) ("An insurer will not be allowed by the use of obscure phrases or exceptions to defeat the purpose for which the policy was procured, and where two interpretations are available, the one allowing the greater indemnity will prevail.")

In the policy at issue we find "an insured" to be ambiguous in that it is unclear whether this

---

[21]The application of Florida law to this issue of contract interpretation has not been raised as an issue on appeal and is clear in light of our past holding applying Florida law in a dispute involving a Florida insured and a foreign insurer. See Shapiro v. Assoc. Int'l Ins. Co., 899 F.2d 1116, 1121 (11th Cir. 1990).

18

phrase in this contract establishes joint or several liability on the part of the insureds. Given that the "an" of "an insured" is undeniably "inconspicuous language," Nu-Air, 822 F.2d at 992, and given that the language is ambiguous, we do not hesitate to conclude that Florida's doctrine of the innocent co-insured shields Mrs. Benfield from the imputation of liability on account of the alleged misdeeds of Mr. Benfield, her co-insured. Our holding is supported by the relevant Florida case law and by the facts of this case.

Florida insurance law places great import upon the law protecting the innocent policyholder from the imputation of wrongdoing. In Eddinger, the appeals court held that coverage was several where the insurance policy provided that "[the] entire policy shall be void if, . . . the insured has willfully concealed or misrepresented any material fact . . .." 366 So. 2d at 123-124 (emphasis added). The court found that since there was no clear indication whether the coverage was joint or several, the coverage was to be construed in favor of the insured. Id. at 124. Since the policy was capable of more than one interpretation, the court determined that "the fraud of a co-insured does not void the coverage of the innocent co-insured." Id. Eddinger established the applicability of the innocent co-insured doctrine to Florida insurance law.

The Florida Supreme Court applied the public policy grounds articulated in Eddinger in resolving a "similar insurance coverage issue." See Everglades Marina, 374 So.2d at 519. The issue before the court in Everglades Marina was whether third party beneficiaries of an insurance contract were prohibited from recovering under an insurance policy when the loss was caused by the intentional criminal acts of the insured and when the policy contained no express language limiting liability. Id. at 518. In declining to establish such a public policy barring recovery by innocent third party beneficiaries, the court noted that the insurance contract contained no express

19

clause excluding coverage for the innocent third party beneficiaries under such a situation and they declined to "insert an exclusion into this insurance contract on the basis of a public policy doctrine. In our view, there is no justification in these circumstances for public policy to mandate this exclusion. The boat owners [the innocent parties seeking recovery] neither knew nor participated in the criminal act." Id. at 519. The Supreme Court then noted that Eddinger had resolved a "similar issue."

It is only when the language of the policy is abundantly clear that courts, applying Florida law, have found joint liability for an innocent co-insured.[22] In 1989, the U.S. District Court for the Southern District of Florida sought to resolve the issue of whether policy language precluding recovery for fraud done by or at the instigation of any insured established joint or several liability. See State Farm Fire and Cas. Ins. Co. v. Kane, 715 F. Supp 1558 (S.D. Fla. 1989). In Kane, that court held that the innocent co-insureds were liable for the intentional act (arson) of another co-insured, and as such were barred from recovering under the policy. Citing to Sales v. State Farm Fire and Cas. Co., 849 F.2d 1383, 1385 (11th Cir. 1988) (a case interpreting Georgia's insurance laws), Kane held that an innocent co-insured may not recover where the fraud provision in a fire policy provided that the policy would be void if any insured engaged in fraud, stating that the phrase "any insured" unambiguously expresses a contractual intent to create joint obligations. See Kane, 715 F. Supp at 1562.

"An insured," unlike "any insured," is ambiguous in that a reasonable person, in reading the

---

[22]Of note, if the exclusionary clause fails to specifically identify the insureds with any terminology, this creates an ambiguity which Florida courts have construed based on public policy to dictate a several policy. See Overton v. Progressive Ins. Co., 585 So.2d 445, 449 (Fla. 4th DCA 1991) (stating that when policies are capable of more than one interpretation, the coverage is generally found to be several rather than joint).

20

contract at issue, could not determine from "an insured" whether this phrase established joint or several liability under Florida law. We make this finding by looking at the plain meaning of "an insured" and after reviewing the thirty page policy as a whole and noting that, outside of the two provisions at issue, throughout the policy the phrases "an insured" and "the insured" are both used often and with apparent interchangeability. Given the ambiguity of the language under this contract and given the strong public policy grounds articulated by Florida courts for protecting the innocent from imputation of fraud, we find that the provisions at issue do not provide joint coverage so as to exclude Mrs. Benfield from recovering under the policy.[23]

Having determined that Florida's innocent co-insured doctrine applies to the policy and to the insured at issue, we find no error by the trial court in its decision to prohibit Millers from producing evidence of possible wrong-doing by the husband, Mr. Benfield. Millers brought this

---

[23]Millers argues that Allstate Ins. Co. v. McCranie, 716 F. Supp. 1440 (S.D. Fla. 1989), should govern the resolution of this issue. We disagree after determining that McCranie is not relevant authority for a matter involving an innocent co-insured. In McCranie, the district court sought to determine whether an insurer was obligated to defend or indemnify its insureds who were being sued in connection with a personal injury lawsuit based on the sexual battery of a minor. One insured, Richard McCranie, was being sued based on his own acts against the child, and the other insured, Virginia McCranie, was sued for her negligence in the supervision of the minor, a guest in her house, since she was aware of the propensities of her brother-in-law, Richard McCranie. Id. at 1442. The issue relevant to the matter at bar was whether the intentional acts of Richard McCranie, another insured, precluded coverage for claims brought against the insured Virginia McCranie. The exclusion in the policy at issue in McCranie excluded coverage for "any bodily injury or property damage which may reasonably be expected to result from the intentional or criminal acts of an insured person . . . ." Id. at 1442.

The McCranie court, citing Allstate Ins. Co. v. Roelfs, 698 F. Supp 815 (D. Alaska 1987) (a case determining the coverage of parents whose son had molested two minor girls who were guests in the parent's home), determined that the use of "an insured" in the exclusion language as opposed to "the insured' resulted in a denial of coverage for the negligent acts of one insured if the co-insured committed an intentional act. 716 F. Supp. at 1448. McCranie distinguished Eddinger on the basis that Eddinger involved the phrase "the insured" and Eddinger's co-insured was, in fact, totally innocent of any wrongdoing.

21

declaratory judgment action. Millers elected to name only Mrs. Benfield as a defendant in their action, rather than naming both Mrs. Benfield and her husband, Mr. Benfield. In their complaint, Millers accused only Mrs. Benfield of burning or causing the property to be burned, and made no mention of any inappropriate or unlawful behavior by Mr. Benfield.

Soon after the suit was brought, Mrs. Benfield sought to join her husband, a named co-insured, on the ground that he was a necessary and indispensable party to this action.[24] In her motion to join Mr. Benfield to the action, Mrs. Benfield declared her intention to claim that Mr. Benfield either negligently or intentionally started the fire which was the subject of the insurance claim. Millers vigorously opposed the requested joinder of Mr. Benfield.[25] The trial court denied Mrs. Benfield's motion. On the eve of trial, Millers moved to amend their complaint, seeking to replace the language alleging that Mrs. Benfield alone caused the property to be burned with language alleging that Mrs. Benfield or Mr. Benfield burned or caused the property to be burned. The motion was denied due to the timing of the motion and the prejudice posed to Mrs. Benfield and

---

[24]In the same motion, Mrs. Benfield sought that the parties be realigned to reflect a more traditional breach of contract action, with Mrs. Benfield as the plaintiff, and Millers as the defendant denying coverage. Mrs. Benfield sought to join Mr. Benfield, a resident of Florida, as an additional defendant in this newly realigned action, thereby destroying federal jurisdiction through the introduction of a non-diverse defendant.

[25]In its motion opposing the joinder of Mr. Benfield, Millers contended:

> 4. Mr. Benfield has not made any claim whatsoever under the policy of insurance in question and in fact, has affirmatively waived any rights he might have to the insurance proceeds. As such, he no longer has any interest in the proceeds and is not an indispensable party to this litigation.
> . . . However it appears from the motion that Mrs. Benfield intends to argue that she is entitled to coverage under the policy based upon an argument Mr. Benfield caused the fire in question. If this is Mrs. Benfield's intent, then Mr. Benfield is merely a potential witness in this case and is not a necessary nor indispensable party to this action.

22

the case proceeded to trial on the original complaint. At trial, when it became clear that Millers could not offer up evidence indicating a conspiracy between Mr. Benfield and Mrs. Benfield, the trial court forbade Millers from introducing evidence of possible misconduct by Mr. Benfield with the design of imputing his conduct to Mrs. Benfield, an innocent co-insured, holding that Millers' proof should be in conformity with the allegations of its complaint. The trial court merely held the plaintiff to the theory that it had expressed in its complaint. Accordingly, we affirm the decision by the trial court barring Millers from introducing evidence of possible misconduct by Mr. Benfield.

## III. CONCLUSION

For the foregoing reasons, the orders of the district court are affirmed in part and reversed in part, and this matter is remanded for a new trial.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.