**200 LESLIE CONDOMINIUM ASSOCIATION, INC.,**
Plaintiff,

v.

**QBE INSURANCE CORP., Defendant.**

Case No. 10–61984–CIV.

United States District Court,
S.D. Florida.

Aug. 28, 2013.

William Corretti Harris, William F. Merlin, Jr., Jean Frances Niven, Douglas Leon Grose, Merlin Law Group, P.A., Tampa, FL, Jeffrey N. Golant, Pompano Beach, FL, for Plaintiff.

Rachel Wagner Furst, Maria Josefa Beguiristain, Raoul G. Cantero, III, White & Case, Miami, FL, William S. Berk, Evelyn Maureen Merchant, Scott Michael Janowitz, Berk Merchant & Sims PLC, William Xanttopoulos, William Xanttopoulos, Esq., Coral Gables, FL, Amy Millan DeMartino, Damian Dwight Daley, William Frederick Fink, Wicker Smith O'Hara McCoy & Ford, P.A., West Palm Beach, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO COUNT II OF THE THIRD AMENDED COMPLAINT

ALICIA M. OTAZO–REYES, United States Magistrate Judge.

Count II of Plaintiff 200 Leslie Condominium Association, Inc.'s ("200 Leslie") Third Amended Complaint was tried to the Court on January 22–24, 2013. In compliance with Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes its Findings of Fact and Conclusions of Law in support of its determination that Defendant QBE Insurance Corporation ("QBE") has prevailed as to Count II.

### PROCEDURAL BACKGROUND

This action arises from damages that 200 Leslie claims to have sustained as a result of Hurricane Wilma in 2005. QBE was the condominium association's property insurer at the time of the hurricane. Based on its estimate that the damages sustained by 200 Leslie were less than the insurance policy deductible, QBE did not pay any benefits to 200 Leslie in 2005. In 2010, 200 Leslie commenced this action alleging that its hurricane damages exceed the policy deductible.

In Count II of its Third Amended Complaint, 200 Leslie seeks a declaratory judgment that the amount of its alleged hurricane damages must be resolved through the appraisal process set out in the insurance policy. In its Order Denying Cross–Motions for Summary Judgment as to Count II of the Third Amended Complaint (hereafter, "Summary Judgment Order") [D.E. 199], the Court determined that, in addition to the declaratory judgment claim in Count II, QBE's First, Second, Third and Tenth Affirmative Defenses (relating to conditions precedent and entitlement to the appraisal process) and the Twelfth Affirmative Defense (fraud and concealment) would be addressed at trial. [D.E. 199 at 6–8].

In making its findings of fact and conclusions of law on these issues, the Court has considered: the testimonial and documentary evidence presented at trial; the written closing arguments [D.E. 221, 232, 235]; the post-trial proposed findings of fact and conclusions of law [D.E. 222, 231]; and the notices of supplemental authority together with responses and replies thereto [D.E. 239, 240, 241, 244, 245, 246, 247]. The Court has also taken into consideration the arguments presented in connection with 200 Leslie's Motion for Judgment Pursuant to Federal Rule of Civil Proce-

dure 50 or 52 [D.E. 224] and QBE's Response and Cross–Motion for Judgment on Partial Findings pursuant to Fed.R.Civ.P. 52(c) [D.E. 234]. *See* Order Denying Post–Trial Motions Without Prejudice, entered contemporaneously herewith.

## FINDINGS OF FACT

### A. The Initial Claim

1. QBE issued a commercial property insurance policy, number QF3614–03, to 200 Leslie that was in force and effect at the time Hurricane Wilma struck South Florida in October, 2005. [Plaintiff's Exhibit 1].

2. The QBE policy's Florida Hurricane Deductible amount is $610,039. *Id.*

3. The QBE policy covered the condominium building located at 200 Leslie Drive in Hallandale, Florida (hereafter, the "200 Leslie Property"). *Id.*

4. The 200 Leslie Property is a multistory, Y-shaped building, whose units have paned glass windows and balconies with sliding glass doors. [Defendant's Exhibits B1, D1, D2, H at 1–3, I at 1].

5. The glass windows and sliding glass doors in the condominium units are covered property under the QBE policy.[1]

6. On October 28, 2005, 200 Leslie notified QBE that it sustained a loss caused by Hurricane Wilma by submitting a Property Loss Notice that described the loss and damage as "tennis court w/ light poles; light poles throughout the building; pool fence." [Plaintiff's Exhibit 3].

7. Florida Intracoastal Underwriters ("FIU") is a third-party managing agent that handles insurance matters for QBE.

8. FIU assigned the investigation of 200 Leslie's claim to Robert Sansone ("Sansone") and his company, Interloss, Inc. ("Interloss").

9. Thereafter, Sansone contacted 200 Leslie's employee and on-site property manager, Damaris Borrelli, to schedule an inspection.

10. Sansone contracted John Wareham ("J. Wareham") to conduct the physical inspection of the 200 Leslie Property.

11. On November 16, 2009, J. Wareham conducted the inspection.

12. J. Wareham received some photographs from 200 Leslie and took additional photographs. [Defendant's Exhibit J].

13. In addition to identifying the property, the photographs generally depicted, as testified by Sansone: dry wall damage in a common area or hallway; damaged canvas canopies; a suspended ceiling tile in the gym common area; cracks on the ceiling of the parking garage with patching; blown metal cabinets from rooftop air conditioning units; damaged trees and tree branches on the ground; light pole and electrical fixture damage; and fencing damage. *Id.*

14. J. Wareham's inspection notes reflect damages to canopies in the pool area, light poles, exhaust fans, trees, fences, two windows in the gym, a window in Unit 530, acoustic ceiling, exterior lighting, water extraction, water intrusion in common areas, cracks in the garage ceiling and a hallway that needed drying. [Plaintiff's Exhibit 29].

15. After receiving J. Wareham's report, Sansone estimated 200 Leslie's damages to be $250,000, including a contingency factor.

---

1. In connection with the parties' cross-motions for summary judgment, QBE made a formal admission that these items are covered property under the policy. *See* Summary Judgment Order [D.E. 199 at 2].

16. Sansone also confirmed with Damaris Borrelli that no new damage had been discovered after J. Wareham's inspection.

17. On December 9, 2005, FIU on behalf of QBE advised 200 Leslie that the cost of repairs for Hurricane Wilma damages was below the policy deductible and paid no benefits. [Plaintiff's Exhibit 24].

### B. The Period from 2005 to 2010

18. A recording of a 200 Leslie Board of Directors meeting held in November 2005 reflects a discussion regarding the potential retention of a consultant to "finagle" a Hurricane Wilma damages claim that would exceed the QBE policy deductible. [Defendant's Exhibit AAAE].

19. An unsigned insurance application with Citizens Property Insurance Corporation, seeking coverage effective 6/17/06, shows 200 Leslie's Hurricane Wilma loss as "patio door; pool fence; tennis fence & lights, pool canvas, 2 windows in gym area." [Defendant's Exhibit O].

20. On August 27, 2007, Sansone generated a formal report to FIU showing a gross adjustment for the 200 Leslie claim of $211,373.24, less the hurricane deductible of $610,039.00, for a net adjustment of $0.00. [Plaintiff's Exhibit 14].

21. At no time from December, 2005 until October, 2010 did anyone from 200 Leslie contact Sansone, FIU or QBE to contest the Hurricane Wilma damages determination made by Interloss/FIU/QBE.

### C. The Genesis of this Litigation

22. Richard Moore ("Moore") is the principal of Paramount Consulting ("Paramount"), a public adjusting and loss consulting company.

23. In the summer of 2010, Plaintiff's counsel Jeffrey Golant ("Golant") provided to Moore information regarding several condominium associations, including 200 Leslie, who had not received payment from QBE for Hurricane Wilma claims.[2]

24. Moore, on behalf of Paramount, approached 200 Leslie regarding damages sustained from Hurricane Wilma.

25. Moore inspected units that 200 Leslie directed him to with problems with their windows and sliding glass doors, as well as the roof.

26. On June 10, 2010, Paramount entered into a public adjusting services contract with 200 Leslie for a 20 percent contingency fee.

27. 200 Leslie retained Golant in late 2010 to represent it in this action for a 40 percent contingency fee.

### D. The 2010 Supplemental Claim

28. On October 19, 2010, 200 Leslie notified QBE that it disputed Interloss/FIU/QBE's prior assessment of 200 Leslie's Hurricane Wilma losses and that it was demanding an appraisal under the terms of the QBE policy (hereafter, the "2010 Supplemental Claim"). [Plaintiff's Exhibit 7].

29. 200 Leslie had already filed this lawsuit on the previous day, October 18, 2010.

30. On October 18, 2010, 200 Leslie also filed a Civil Remedy Notice of Insurer Violations against QBE with Florida's Department of Financial Services. [Plaintiff's Exhibit 5].

31. At the time 200 Leslie filed suit, there were no outstanding requests for compliance with any post loss obligations by QBE.

---

**2.** Golant testified at trial as 200 Leslie's corporate representative. As a result, he was not permitted to actively participate as 200 Leslie's counsel.

32. QBE has assigned a single claim number to 200 Leslie's Hurricane Wilma insurance claim.

### E. Appraisal Provision

33. The QBE Policy includes an Appraisal Provision, which states:

> If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:
>
> a. Pay its chosen appraiser, and
>
> b. Bear the other expenses of the appraisal and umpire equally.
>
> If there is an appraisal, we will still retain our right to deny the claim.

[Plaintiff's Exhibit 1].

34. FIU/QBE did not go to appraisal in response to 200 Leslie's October 19, 2010 demand because it invoked the post-loss conditions imposed by the policy on 200 Leslie.

### F. Duties in the Event of Loss or Damage

35. The QBE policy imposes on 200 Leslie a number of duties in the event of loss or damage to the covered property. [Plaintiff's Exhibit 1].

36. One such duty is to send QBE, within 60 days of its request, a sworn proof of loss on a form provided by QBE containing information requested by QBE to investigate 200 Leslie's claim. *Id.*

37. Another such duty is to provide, at QBE's request, complete inventories of the damaged and undamaged property, including quantities, costs, values and amount of loss claimed. *Id.*

38. Another such duty is to permit QBE, as often as may be reasonably required, to examine and make copies of 200 Leslie's books and records. *Id.*

39. Another such duty is to submit to an Examination Under Oath, at such times as may be reasonably required, about any matter relating to the insurance or the claim, including 200 Leslie's books and records. *Id.*

40. Another such duty is to permit QBE, as often as may be reasonably required, to inspect the property. *Id.*

### G. Proof of Loss

41. On August 4, 2011, 200 Leslie provided to QBE a Sworn Statement in Proof of Loss (hereafter, "Proof of Loss") executed by Richard Vilain ("Vilain"), a member of 200 Leslie's Board of Directors. [Plaintiff's Exhibit 4].[3]

42. 200 Leslie attached to the Proof of Loss an estimate prepared by Taylor Contracting and Roofing, Inc. ("Taylor") showing 200 Leslie as the insured and Paramount as the claim representative (hereafter, "Taylor Estimate"). [Plaintiff's Exhibit 9].

43. 200 Leslie also attached to the Proof of Loss a "200 Leslie Condominium Impact Glazing Retrofit Proposal" prepared for Paramount by WindReady (hereafter, "WindReady Proposal"). [Plaintiff's Exhibit 8].

44. The Taylor Estimate shows a total of $10,934,677.49 for roof replacement, re-

---

**3.** The Proof of Loss was also signed by Maria Lago.

moval and replacement of windows per the Wind Ready Proposal, and various other repair and replacement jobs throughout the 200 Leslie Property. [Plaintiff's Exhibit 9].

45. The WindReady Proposal shows a total of $7,907,404.43 for removal of pre-existing windows and doors and installation of impact windows and doors in every condominium unit, plus common area windows. [Plaintiff's Exhibit 8].

46. In the Proof of Loss, 200 Leslie states that its "whole loss and damage" is $10,934,677.49. [Plaintiff's Exhibit 4].

47. After applying the policy deductible of $610,039.00, the amount claimed by 200 Leslie in the Proof of Loss is $10,324,638.49. *Id.*

48. The language in the Proof of Loss form stating that "no articles are mentioned herein or in the annexed schedules but such as were destroyed or damaged at the time of said loss" is crossed-out and initialed by Vilain. *Id.*

49. Prior to August 4, 2011, Moore inspected over 10 percent but less than 20 percent of the units at the 200 Leslie Property, at various elevations and orientations.

50. Moore believes that at least 30 percent of the units that he inspected as of August 4, 2011 exhibited damage that was consistent with windstorm damage.[4]

51. Moore extrapolated his 30 percent damage finding to the over 80 percent of the units that he did not inspect.

52. Moore told WindReady that every window and every sliding glass door at the 200 Leslie Property needed to be replaced and asked WindReady to write an estimate, which is the WindReady Proposal.

53. The Court finds Moore's extrapolation of his observations of 30 percent purported damage to the windows and sliding glass doors of a limited number of units to the entire Y-shaped property to be speculative.[5]

54. Prior to August 4, 2011, Moore also inspected the roof at the 200 Leslie Property.

55. According to Moore, the separation of the roof membrane on the roof that he observed was consistent with hurricane damage.

56. Moore asked Taylor to estimate the cost of replacing the roof at the 200 Leslie Property, which cost is reflected in the Taylor Estimate.

57. Among 200 Leslie's books and records was a report from Pistorino & Alam Consulting Engineers, Inc. (hereafter, "Pistorino & Alam Report") dated November 25, 2003. [Defendant's Exhibit AAW]. The Pistorino & Alam Report found, *inter alia:* ponding water, algae and mold on the roof; a lack of positive roof drainage; and water intrusion into an interior corridor. *Id.* at 4, 6.

58. Moore was not provided with the Pistorino & Alam Report by Damaris Borrelli or 200 Leslie's building maintenance person in connection with his inspection of the 200 Leslie Property.

---

**4.** According to Moore, the 30 percent damage figure he calculated relates to "the 30 percent rule in the Florida Building Code." [D.E. 217 at 219]. It is 200 Leslie's contention, as testified by Golant, that the QBE policy provisions relating to glass and law and ordinance coverage, together with the fact that the policy is a replacement-cost policy, would allow for payment to replace undamaged windows and sliding glass doors. [D.E. 215 at 42–45].

**5.** At trial, the Court took judicial notice of the fact that hurricane damage is not uniform across a building.

59. Golant was familiar with the Pistorino & Alam Report and testified that Moore made sure that the conditions noted in the Report were not included in the Taylor Estimate, but was unable to explain how such exclusion was accomplished given that the Taylor Estimate called for complete replacement of the roof at the 200 Leslie Property.

60. Moore provided the completed Proof of Loss to Golant to deliver to Vilain.

61. Vilain was asked to sign the Proof of Loss at a meeting with Moore and Golant.

62. Vilain did not cross-out the language stating that "no articles are mentioned herein or in the annexed schedules but such as were destroyed or damaged at the time of said loss" in the Proof of Loss form; Golant did.

63. Golant believed that it was inappropriate to put this language in the Proof of Loss form because it is not an accurate description of the benefits under the QBE policy given that, according to him, such benefits are not strictly limited to items that were directly damaged by the hurricane.[6]

64. Golant also testified that it was not possible to give a figure for the "whole loss and damage" while, at the same time, state that the figure being provided included only damaged property when the figure also included undamaged property.

65. However, the problem created by the inclusion of undamaged property in the $10,934,677.49 Proof of Loss figure was not remedied by striking the subject language because, due to such inclusion, the figure did not actually equate to 200 Leslie's "whole loss and damage."

66. Therefore, the Court does not find Golant's explanation for striking out the language in the Proof of Loss form stating that "no articles are mentioned herein or in the annexed schedules but such as were destroyed or damaged at the time of said loss" to be reasonable or justified.

67. Moreover, contrary to Golant's reasoning, the potential application of "the 30 percent rule" and its interplay with the QBE policy provisions did not compel alteration of the form and inclusion of undamaged property in the Proof of Loss. Had 200 Leslie actually prepared an inventory of damaged and undamaged property, as required by the policy, such inventory could have provided the basis for a determination, in the appraisal context, as to whether the policy afforded coverage for undamaged property.

68. Between June and August, 2011, before signing the Proof of Loss, Vilain had discussions with Moore regarding Moore's damage assessment of the 200 Leslie Property.

69. Vilain and Moore went over the Taylor Estimate and the WindReady Proposal prior to Vilain's signing the Proof of Loss.

70. Based on Moore's background and experience, Vilain felt that he could realistically rely on Moore to assess the damages sustained by 200 Leslie from Hurricane Wilma.

71. Based on the information provided to him, Vilain also felt that the $10 million plus figure in the Proof of Loss was a realistic and truthful number for 200 Leslie's claim.

72. Vilain understood and thought that it was reasonable for the verbiage "no articles are mentioned herein or in the

---

**6.** As noted above, Golant's rationale for coverage of undamaged property is based on "the 30 percent rule" and the QBE policy provi-

sions relating to glass and law and ordinance coverage, together with the fact that the policy is a replacement-cost policy.

annexed schedules but such as were destroyed or damaged at the time of said loss" to be crossed-out in the Proof of Loss form because sometimes structural and other items that are not damaged need to be replaced and become part of the cost in an estimate.

73. The Court finds Vilain's testimony regarding his mental state in executing the Proof of Loss to be credible.

74. QBE did not accept the Proof of Loss due to the striking of the language stating that "no articles are mentioned herein or in the annexed schedules but such as were destroyed or damaged at the time of said loss."

75. According to QBE, once the form was altered by striking this language, the form ceased to be QBE's form.

76. The Court finds that 200 Leslie did not send QBE a sworn proof of loss on a form provided by QBE containing information requested by QBE, as required by the QBE policy.

### H. Inventory of Damaged and Undamaged Property

77. Andrew Bertucci ("Bertucci") is a senior claims adjuster with FIU to whom the 2010 Supplemental Claim was assigned.

78. After receiving the Proof of Loss, FIU on behalf of QBE requested from 200 Leslie an inventory of damaged and undamaged property.

79. The Proof of Loss incorporates undamaged windows and sliding glass doors.

80. Neither the Taylor Estimate nor the WindReady Proposal identifies which components of the 200 Leslie Property are damaged and which are undamaged.

81. Moore cannot give a specific count as to the number of units that actually had damage to a window or sliding glass door that required replacement.

82. Nobody at 200 Leslie knows which windows and sliding glass doors were damaged and which were not damaged.

83. As of the time of trial, QBE had not received from 200 Leslie the separate inventory of damaged and undamaged property that it had requested.

84. According to Bertucci, appraisal is not appropriate because QBE does not know 200 Leslie's actual valuation of its Hurricane Wilma damages.

85. Without information regarding the damaged/undamaged breakdown, Bertucci could not determine what it was required to pay under the terms of the QBE policy; and the distinction is important because it shows what needs to actually be repaired or replaced from hurricane damage.

86. The Court accepts as legitimate the reasons given by Bertucci why QBE needed the separate inventory of damaged and undamaged property that it had requested. Indeed, the Court found Bertucci's testimony in this regard to be straightforward and credible.

87. The Court finds that 200 Leslie did not provide QBE with complete inventories of the damaged and undamaged property, including quantities, costs, values and amount of loss claimed, as required by the QBE policy.

### I. Examination and Copying of Books and Records

88. Sometime between August and December 2011, QBE requested that 200 Leslie make its books and records available for inspection.

89. 200 Leslie provided QBE with access to its books and records so that QBE could inspect and copy the documents and QBE carried out the inspection.

90. Given this unrestricted access, the Court finds that 200 Leslie adequately permitted QBE to examine and make copies of 200 Leslie's books and records.

## J. Examination Under Oath

91. On September 3, 2011, QBE sent 200 Leslie a letter demanding an Examination Under Oath ("EUO") of the 200 Leslie representative with the most knowledge in the following areas (hereafter, "EUO Letter"):

- The quantum of loss
- The cause of the loss
- The maintenance history of the buildings
- Preparation of and support for the claim package
- Repairs/replacement of damaged property and any estimates for same
- Whether the repair and replacement of windows and sliding glass doors which provide access to individual units are the responsibility of the association or its members and the insured Association's governing documents and records relating thereto.

[Defendant's Exhibit AB8].

92. The Court finds that the subject areas of inquiry set forth in the EUO Letter fall within the scope of the QBE policy's EUO provision permitting examination about any matter relating to the insurance or the claim, including 200 Leslie's books and records.

93. On December 20, 2011, Vilain, as 200 Leslie's representative, submitted to the EUO by QBE. [Plaintiff's Exhibits 10 & 11].

94. At the time of the EUO, Vilain was the President of 200 Leslie's Board of Directors ("Board").

95. 200 Leslie offered Vilain as its EUO representative because he was the most knowledgeable individual on the Board at the time about 200 Leslie's books and property insurance.

96. Vilain believed that Jeffrey Osborn ("Osborn"), who had been the President of the Board at the time of Hurricane Wilma, would have been a better candidate for the EUO, but Osborn no longer resided at 200 Leslie at the time of the EUO. Two other Board members were relatively new and had no knowledge of the 2010 Supplemental Claim. As a result, Vilain also concluded that he was the most appropriate 200 Leslie representative for the EUO. The Court accepts this conclusion as reasonable.

97. Vilain was not provided with a copy of the EUO Letter prior to the EUO.

98. Vilain did not look at any minutes or records of 200 Leslie in preparation for the EUO.

99. Vilain's only preparation for the EUO consisted of meeting with Golant and going over the Proof of Loss for about five minutes.

100. Although Vilain did not refuse to answer any of the questions posed by QBE, he did not know the answer to many of the questions.

101. The Court finds that Vilain did not reasonably prepare for the EUO and, as a result, did not adequately respond to QBE's inquiries regarding matters relating to the insurance or the claim, including 200 Leslie's books and records, as required by the QBE policy.

102. Hence, the Court finds that 200 Leslie did not fully comply with the QBE policy requirement that its representative submit to examination about any matter relating to the insurance or the claim, including 200 Leslie's books and records.

### K. Inspection of the Premises

103. In late 2011, Bertucci, on behalf of FIU/QBE requested an inspection of the 200 Leslie Property.

104. The inspection was organized by Sansone and took place in November 2011.

105. The inspectors were organized into three teams, with each team consisting of an engineer, an adjuster, and a general contractor.

106. There were also a floating glass contractor and a roofing contractor.

107. The inspection teams had full access to the premises, including the individual condominium units, except for seven that were unavailable.

108. Given this full access, Court finds that 200 Leslie adequately permitted QBE to inspect the property.[7]

109. Daniel Lavrich ("Lavrich") prepared an inspection protocol to be used by all teams.

110. Lavrich has performed more than 240 inspections for QBE in the past five years and has been paid over $2 million.

111. Lavrich's protocol called for checking the components of the windows and sliding glass doors to see, generally, if there were any outwards signs of damage, if anything was broken, if the assemblies were straight and operated correctly, and if any component was loose.

112. The inspection team members made field notes of their observations and measurements and took numerous photographs. [Defendant's Exhibits B, D, E, F, G, H, I, K, L].

113. Of 270 units that were inspected, the teams found one window pane to be broken, five panes of glass that were debonded or loose, and one dented sliding glass door.

114. According to Lavrich, a Y-shaped building such as the 200 Leslie Property would not sustain the same wind damage from a hurricane on all of its exposed sides.[8]

115. In Lavrich's opinion, it would be a false statement to say that all the windows and sliding glass doors at the 200 Leslie Property needed to be replaced.

116. Adam Locke ("Locke") is one of the engineers who participated in the inspection of the 200 Leslie Property.

117. Locke has conducted 25 to 50 investigations on behalf of QBE and was retained by a condominium association in a matter against QBE.

118. Locke also opined that it would be a false statement to say that all the windows and sliding glass doors at the 200 Leslie Property needed to be replaced.

119. Glass contractor Edward Morris ("Morris") inspected 14 units at the 200 Leslie Property.

120. According to Morris, windows and sliding glass doors at the 200 Leslie Property are original and the glass is annealed glass, which is straight glass.

121. Morris opined that it would be a false statement to say that any of the windows and sliding glass doors in the 14 units he inspected needed to be replaced.

122. John "Jack" Brown ("Brown") inspected the 200 Leslie Property roof.

123. Brown has been retained by QBE for roof inspections approximately 125 times.

---

7. Although the inspection team members were not permitted to speak to the individual unit owners, this was not a policy requirement.

8. As noted above, the Court took judicial notice at trial of the fact that hurricane damage is not uniform across a building.

124. According to Brown, the 200 Leslie Property roof is a Y-shaped flat asphalt and gravel roof with a three feet high parapet wall around the perimeter edge, air conditioner units, an elevator equipment tower and a stair tower

125. Brown testified regarding conditions he observed on the roof of the 200 Leslie Property, including: water intrusion into the roof system from concrete slabs to which air conditioner units are attached; residual algae and dirt accumulation from ponded water; one or more vapor blisters; wear on the roof vent; absence of a waterspout; a bush growing out of the parapet wall and vegetation in the roof's gravel area; plastic pipe penetrations with foam sealant, which is subject to decay from ultraviolet rays; and a four inch cut in the roofing system.[9]

126. Notwithstanding their prior work for QBE, the Court finds the testimony of Lavrich, Locke, Morris and Brown to be professional, unbiased and credible.

## L. QBE's Denial of the Claim

127. The QBE policy Commercial Coverage Part includes a section entitled "Concealment, Misrepresentation or Fraud," which states:

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this Coverage Part.

[Plaintiff's Exhibit 1].

128. On September 21, 2012, QBE sent to 200 Leslie a letter denying 200 Leslie's hurricane damages claim in its entirety on the grounds that 200 Leslie had failed to comply with its post-loss obligations and that 200 Leslie's purported misrepresentations regarding its damages voided all coverage under the policy. [Defendant's Exhibit AN].

## CONCLUSIONS OF LAW

The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. The substantive law of Florida governs this dispute. Based on the foregoing factual findings and the applicable legal authorities, the Court concludes that 200 Leslie cannot prevail on its declaratory judgment claim to compel appraisal due to its failure to comply with several of its post-loss obligations. Further, the Court rejects 200 Leslie's post-trial request that it be given another chance to do so. Although the foregoing rulings are sufficient to dispose of the case, the Court also addresses QBE's fraud and concealment affirmative defense for the sake of completeness and finds that such defense is not supported by the evidence.

### 1. Conditions precedent to appraisal

■ Before appraisal can be invoked, an insured must comply with the policy's

---

9. Although Brown also opined that the conditions he observed were not related to wind damage but to the age of the roof and lack of maintenance, and that it would be a false statement to say that the roof needed to be replaced as a result of Hurricane Wilma, the Court is not considering this testimony because it deals with causation, an issue that was not addressed at trial. *See* Summary Judgment Order [D.E. 199 at 7–8] (deferring QBE's causation-related affirmative defenses to the appraisal process, if any).

post-loss conditions. *Galindo v. ARI Mut. Ins. Co.*, 203 F.3d 771, 777 (11th Cir.2000) (citing *U.S. Fid. & Guar. Co. v. Romay,* 744 So.2d 467 (Fla. 3d DCA 1999)). This requirement "enables the insurance companies to investigate the insureds' claims and to disagree with the loss amount before the appraisal term becomes effective." *Id.* As explained by the Third District Court of Appeal in *Romay.* "permitting the insured to compel appraisal without first complying with the policy's post-loss obligations would place the insurer at a considerable disadvantage entering the appraisal process." *Romay,* 744 So.2d at 471 n. 4. *See also Jacobs v. Nationwide Mut. Fire Ins. Co.,* 236 F.3d 1282, 1285 (11th Cir.2001) ("*Romay* requires [insureds] to fulfill all of their post-lost obligations under the insurance policy [ ] before invoking their right of appraisal.").

The QBE policy's post-loss obligations are: Proof of Loss; Inventory of Damaged and Undamaged Property; Examination and Copying of Books and Records; Examination Under Oath; and Inspection of the Premises. The Court has found, as a matter of fact, that 200 Leslie adequately permitted QBE to examine and make copies of 200 Leslie's books and records and to inspect the premises. Therefore, the Court need only address the other three post-loss duties: Proof of Loss; Inventory of Damaged and Undamaged Property; and Examination Under Oath.

### 2. *Proof of Loss*

██ The Court has found, as a matter of fact, that 200 Leslie did not provide to QBE a sworn proof of loss on a form provided by QBE containing information requested by QBE, as required by the QBE policy. The basis for this conclusion is the alteration of the QBE form by striking the language stating that "no articles are mentioned herein or in the annexed schedules but such as were destroyed or damaged at the time of said loss" in the Proof of Loss form. The Court has found Golant's explanation for altering the QBE form not to be reasonable or justified.

Hence, the Court concludes that 200 Leslie breached the Proof of Loss post-loss condition.

### 3. *Inventory of Damaged and Undamaged Property*

██ The Court has also found, as a matter of fact, that 200 Leslie did not provide QBE with complete inventories of the damaged and undamaged property, including quantities, costs, values and amount of loss claim, as required by the QBE policy. The basis for this conclusion is that: neither the Taylor Estimate nor the WindReady Proposal identifies which components of the 200 Leslie Property are damaged and which are undamaged; Moore cannot give a specific count as to the number of units that actually had damage to a window or sliding glass door that required replacement; and nobody at 200 Leslie knows which windows and sliding glass doors were damaged and which were not damaged. Indeed, as of the time of trial, QBE had not received from 200 Leslie the separate inventory of damaged and undamaged property that it had requested.

██ 200 Leslie attempts to evade this post-loss obligation by arguing that the term "inventories of damaged and undamaged property" in the QBE policy refers only to a claim for damage to the contents of a building, hence is inapplicable to 200 Leslie's claim for building damage. *See* Notice of Supplemental Authority [D.E. 241 at 1]. According to 200 Leslie, a dictionary definition of the word "inventory" as "a complete list of items such as property, goods in stock, or the contents of a building" supports its interpretation of the policy term. *Id.* Because the definition of

"inventory" provided by 200 Leslie is in the disjunctive, it is not limited to "contents of a building" as argued by 200 Leslie. Moreover, while the QBE policy has multiple references to "personal property" [Plaintiff's Exhibit 1], the required inventories are of "property." This distinction makes it clear that the QBE policy's requirement that 200 Leslie provide "inventories of damaged and undamaged property" encompasses all property covered by the policy and is not limited to building contents or personal property. *Valiant Ins. Co. v. Evonosky*, 864 F.Supp. 1189, 1191 (M.D.Fla.1994) ("Under Florida law, courts must construe an insurance contract in its entirety, striving to give every provision meaning and effect.").

Hence, the Court concludes that 200 Leslie breached the Inventory of Damaged and Undamaged Property post-loss condition.

### 4. *Examination Under Oath*

■ The Court has also found, as a matter of fact, that 200 Leslie did not fully comply with the QBE policy requirement that its representative submit to examination about any matter relating to the insurance or the claim, including 200 Leslie's books and records. The Court accepts Vilain's assessment that he was the most appropriate 200 Leslie representative for the EUO, due to the departure of the individual who had been the President of the Board at the time of Hurricane Wilma. Nevertheless, Vilain did not adequately prepare for the EUO and, as a result, did not adequately respond to QBE's inquiries.

Hence, the Court concludes that 200 Leslie breached the Examination Under Oath post-loss condition.

### 5. *Prejudice*

■ A condition precedent "can be avoided by a party alleging and showing

that the insurance carrier was not prejudiced by noncompliance with the condition." *Soronson v. State Farm Fla. Ins. Co.*, 96 So.3d 949, 952 (Fla. 4th DCA 2012) (citing *Bankers Ins. Co. v. Macias*, 475 So.2d 1216, 1218 (Fla.1985)). The rule in Florida is that prejudice to the insurer will be presumed and the burden of showing lack of prejudice "should be on the party seeking an avoidance of a condition precedent." *Bankers*, 475 So.2d at 1218. By contrast, in cases involving an insured's failure to comply with a condition subsequent, "it is proper to place the burden of showing prejudice on the insurer." *Id.*

■ Because Proof of Loss, Inventories of Damaged and Undamaged Properties and Examination Under Oath are conditions precedent to appraisal, 200 Leslie had the burden to show at trial that QBE was not prejudiced by its failure to comply with these post-loss conditions. In this regard, 200 Leslie's reliance on *Ramos v. Northwestern Mut. Ins. Co.*, 336 So.2d 71 (Fla.1976), for the proposition that "QBE could still not prevail in this action unless it were able to also prove that the asserted non-compliance somehow caused QBE to suffer substantial prejudice," [D.E. 224 at 14], is misplaced. *Ramos* involved a failure to cooperate, which is a condition subsequent, rather than a condition precedent. *Ramos*, 336 So.2d at 74; *Bankers*, 475 So.2d at 1218.

■ 200 Leslie did not offer any evidence at trial that QBE was not prejudiced by its breaches of the Proof of Loss, Inventories of Damaged and Undamaged Properties and Examination Under Oath post-loss conditions. It did not elicit any testimony from Bertucci that QBE could go to appraisal despite these breaches. On the contrary, Bertucci's credible testimony was that appraisal is not appropriate because QBE does not know 200 Leslie's

actual valuation of its Hurricane Wilma damages. According to Bertucci, without information regarding the damaged/undamaged breakdown, he could not determine what it was required to pay under the terms of the QBE policy; and the distinction is important because it shows what needs to actually be repaired or replaced from hurricane damage. Because 200 Leslie did not carry its burden of showing prejudice, it cannot avoid the conditions precedent to appraisal with which it did not comply. *Soronson,* 96 So.3d at 952; *Bankers,* 475 So.2d at 1218.[10]

200 Leslie also contends that *Scottsdale Ins. Co. v. Univ. at 107th Ave.,* 827 So.2d 1016 (Fla. 3d DCA 2002), mandates a finding of no prejudice to QBE arising from 200 Leslie's breach of the post-loss conditions given the discovery conducted in this action [D.E. 237 at 14]. According to 200 Leslie, *Scottsdale* "expressly holds that the use of discovery is sufficient to overcome any deficiencies concerning post-loss obligations." *Id.* There are two problems with 200 Leslie's argument. First, there is no such broad holding in the *Scottsdale* opinion. In *Scottsdale,* the insurer's counsel admitted at a summary judgment hearing, "that Scottsdale had obtained what Scottsdale wanted post-loss and pre-suit during the course of the suit and that the documents that Scottsdale asked for post-loss and pre-suit were now in their possession through discovery." *Id.* at 1016–17. It was on the basis of this admission that the Third District Court of Appeal ruled that the trial court had properly compelled appraisal. *Id.* QBE had not made any such concession on which to predicate a similar ruling. Second, and more importantly,

were the Court to misread *Scottsdale* by accepting 200 Leslie's argument, it would be disregarding Eleventh Circuit precedent and Florida law. *Galindo,* 203 F.3d at 777 (before appraisal can be invoked, an insured must comply with the policy's post-loss conditions) (citing *Romay,* 744 So.2d 467); *Jacobs,* 236 F.3d at 1285 ("*Romay* requires [insureds] to fulfill all of their post-lost obligations under the insurance policy [ ] before invoking their right of appraisal.").

Therefore, 200 Leslie cannot avoid its non-compliance with its post-loss obligations on the grounds of lack of prejudice to QBE.

### 6. *Post-trial Compliance*

█ As an alternative to the entry of judgment in favor of QBE, 200 Leslie requests that it be granted an opportunity to "do whatever the Court thinks it should do" to fully comply with the conditions precedent to appraisal. [D.E. 237 at 15–17]. 200 Leslie already had an opportunity to satisfy those conditions after filing this lawsuit when the Honorable Robin S. Rosenbaum dismissed 200 Leslie's appraisal claim without prejudice. [D.E. 54]. There is no basis and 200 Leslie has not proffered any legal authorities in support of its ***post-trial*** request to go back to the drawing board.[11] Moreover, the Court's role is to enter judgment based on the facts presented to it at trial and the applicable law, Fed.R.Civ.P. 52, not to advise 200 Leslie on how to comply with its contractual obligations and wait for another round of litigation. *See Garden–Aire Village S. Condo. Ass'n, Inc. v. QBE Ins.*

---

**10.** 200 Leslie asks that the Court re-open the evidence to further consider the prejudice issue [D.E. 237 at 12–13]. The Court denies this request because 200 Leslie had ample opportunity to present its evidence at trial.

**11.** As noted by QBE, and confirmed by the Court, the cases cited by 200 Leslie involved pre-rather than post-trial compliance with conditions precedent to appraisal [D.E. 238 at 7].

*Corp.*, Case No. 10–61985–CIV–DIMI-TROULEAS, [D.E. 187 at 3 (S.D.Fla. May 10, 2013) ("This court does not give advisory opinions on what might happen in the future.").

Therefore, the Court denies 200 Leslie's request.

### 7. *Fraud and Concealment*

 "It is well established that policy provisions voiding insurance coverage based upon intentional acts of concealment, misrepresentation, or fraud are enforceable under Florida law." *El–Ad Residences at Miramar Condo. Ass'n, Inc. v. Mt. Hawley Ins.*, No. 09–60723–CIV, 2010 WL 8961438, at *6 (S.D.Fla. Sept. 28, 2010) (citing *Lopes v. Allstate*, 873 So.2d 344, 345 (Fla. 3d DCA 2004); *Nova Hills Villas Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co.*, No. 0760939Civ, 2008 WL 179878, at *4 (S.D.Fla. Jan. 21, 2008)). "The essential elements of common-law fraud under Florida law are: (1) a false statement of fact; (2) known by the person making the statement to be false at the time it was made; (3) made for the purpose of inducing another to act in reliance thereon; (4) action by the other person in reliance on the correctness of the statement; and (5) resulting damage to the other person." *Id.* (citing *Gandy v. Trans World Computer Tech. Grp.*, 787 So.2d 116, 118 (Fla. 2d DCA 2001)). "But, when applying insurance contract provisions voiding coverage on account of fraud, 'if there is a willful false statement of material fact, there is no requirement than an insurer show prejudicial reliance in order to enforce the contract provision.'" *Id.* (citing *Lopes*, 873 So.2d at 347; *Michigan*

*Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 923 (11th Cir.1998)).

 Applying these legal standards, the Court finds that QBE has not met its burden of proving fraud and concealment on the part of 200 Leslie with respect to the Proof of Loss, the EUO, or otherwise, in connection with 200 Leslie's claim.

With regard to the Proof of Loss, Vilain, 200 Leslie's representative who executed it, testified that:

- Based on Moore's background and experience, he felt that he could realistically rely on Moore to assess the damages sustained by 200 Leslie from Hurricane Wilma.

- Based on the information provided to him, he also felt that the $10 million plus figure in the Proof of Loss was a realistic and truthful number for 200 Leslie's claim.

- He understood and thought that it was reasonable for the verbiage "no articles are mentioned herein or in the annexed schedules but such as were destroyed or damaged at the time of said loss" to be crossed-out in the Proof of Loss form because sometimes structural and other items that are not damaged need to be replaced and become part of the cost in an estimate.

The Court has found Vilain's testimony regarding his mental state in executing the Proof of Loss to be credible. Therefore, QBE has not proved that Vilain made a false statement of fact known by him to be false at the time he signed the Proof of Loss.[12]

---

12. The Court has accepted as professional, unbiased and credible the testimony of the members of QBE's inspection team, namely, Lavrich, Locke, Morris and Brown. As a result, the Court has accepted their opinion testimony that it would be a false statement to say that all the windows and sliding glass doors at the 200 Leslie Property needed to be replaced. However, this is not enough to establish fraud on the part of 200 Leslie because the Court has also accepted Vilain's

■ With regard to the EUO, the only shortcoming found by the Court was that Vilain, 200 Leslie's representative who submitted to it, did not reasonably prepare for the EUO and, as a result, did not adequately respond to QBE's inquiries. Thus, there is no finding that Vilain made any false statements at the EUO. QBE takes a different tack, and argues that Vilain's lack of knowledge at the EUO regarding (1) the Pistorino & Alam Report, and (2) the recorded discussion in a 200 Leslie Board of Directors meeting held in November 2005 regarding the potential retention of a consultant to "finagle" a Hurricane Wilma damages claim that would exceed the QBE policy deductible constitutes concealment. QBE reads too much into Vilain's lack of preparation for the EUO. Indeed, there is no evidence whatsoever to support QBE's theory that the intent to conceal these matters was the motive behind such lack of preparation. Moreover, the fact that QBE obtained the Pistorino & Alam Report and the November 2005 recording through 200 Leslie's compliance with its post-loss obligation to provide QBE with access to its books and records debunks the concealment theory.[13]

■ QBE also contends that, because 200 Leslie relied on Golant and Moore for the preparation of its Proof of Loss, any fraud by those individuals should be imputed to 200 Leslie. Initially, there is no fraud to impute because there is no finding by the Court that Golant and/or Moore engaged in fraudulent conduct with respect to 200 Leslie's 2010 Supplemental Claim. Rather, the Court has only found that Moore engaged in speculative extrapolation, that Golant was unable to explain

how Moore could have excluded the Pistorino & Alam Report from the Taylor Estimate, and that Golant's explanation for altering the Proof of Loss form was not reasonable or justified. Moreover, QBE relies solely on a New York case, *Latha Rest. Corp. v. Tower Ins. Co.*, 38 A.D.3d 321, 322, 831 N.Y.S.2d 411 (N.Y.App.Div. 1st Dept.2007), [D.E. 231 at 25], even though, as noted above, this case is governed by Florida law. Therefore, the Court rejects QBE's imputation theory as a basis for finding fraud and concealment on the part of 200 Leslie.

Finally, QBE argues that 200 Leslie's Proof of Loss is inflated due to the inclusion of undamaged property and that this is enough to support a finding of fraud, relying on *Berkshire Mut. Ins. Co. v. Moffett*, 378 F.2d 1007 (5th Cir.1967) and *Schneer v. Allstate Indem. Co.*, 767 So.2d 485 (Fla. 3d DCA 2000). Neither case supports QBE's proposition.

In *Moffett*, the insurer contended "that the evidence [at trial] clearly established that the plaintiff had attempted to defraud by falsely including in his original claim items which were not in the building at the time of the fire and by overvaluation of the destroyed property, and that these false representations rendered the fire insurance policy void." *Moffett*, 378 F.2d at 1012. The Fifth Circuit noted that "[t]he trial judge properly charged the jury on the issues of concealment and fraud. It is the general rule of law with respect to sworn proofs of loss, that if such proofs contain false statements, known by the person making them to be false, for the purpose of perpetrating a fraud, the entire policy of insurance will be voided and the

---

testimony regarding his mental state at the time he signed the Proof of Loss.

13. QBE also assigns a concealment motive to the fact that Vilain, rather than Damaris Borrelli or 200 Leslie's maintenance supervisor,

appeared for the EUO. However, the Court has accepted Vilain's conclusion that he was the most appropriate 200 Leslie representative for the EUO as reasonable.

person making the fraudulent statement will take nothing under the policy." *Id.* (citing *Chaachou v. Am. Cen. Ins. Co.*, 241 F.2d 889 (5th Cir.1957)). Thus, according to the Fifth Circuit,

> an overestimate of the value of goods lost in a fire, an error in judgment with respect to fixing a value, a mistake, or an inadvertence, will not render an insurance contract void. Since reasonable men may differ as to the values which they place on particular objects, the rule voiding a policy of insurance will not apply in its severity unless the proof of the false swearing was such that no other conclusion can be drawn than that a purposeful misrepresentation was intended.

*Id.*

Here, the Court has found, *supra,* that 200 Leslie's $10,934,677.49 Proof of Loss figure did not actually equate to 200 Leslie's "whole loss and damage" due to its inclusion of undamaged property. Although the figure can be deemed to be "inflated" based on this finding, this is not enough because "the rule voiding a policy of insurance will not apply in its severity unless the proof of the false swearing was such that no other conclusion can be drawn than that a purposeful misrepresentation was intended." *Id.* As discussed above, QBE has not proved that Vilain made a false statement of fact known by him to be false at the time he signed the Proof of Loss and the Court has rejected QBE's concealment and imputation theories. Therefore, the "purposeful misrepresentation" element from *Moffett* has not been met.

QBE's reliance on *Schneer* for its contention that an inflated claim is the same as a fraudulent claim is similarly misplaced. In *Schneer,* the jury made a finding of fraud and misrepresentation and the Third District Court of Appeal only dealt with issues of admissibility of expert testimony and divisibility of an insurance policy. *Schneer,* 767 So.2d at 488–90. Therefore, nothing in the *Schneer* opinion supports QBE's broad proposition.

Thus, the Court concludes that QBE has not carried the burden of proving its fraud and concealment affirmative defense.

### *CONCLUSION*

Based on the foregoing Findings of Fact and Conclusions of Law, QBE has prevailed as to Count II of the Third Amended Complaint. Therefore, the Court will enter a separate final judgment in favor of QBE and against 200 Leslie under Fed. R.Civ.P. 58, as required by Fed.R.Civ.P. 52(a).[14]

---

**14.** By agreement of the parties, the Court did not address Count I of the Third Amended Complaint at trial and deferred its disposition until after trial. *See* Supplemental Order Re: Pretrial Conference [D.E. 189 at 1]. The Court is dismissing Count I as moot by separate Order after considering the parties' post-trial memoranda. *See* Order Dismissing Count I of the Third Amended Complaint, entered contemporaneously herewith.